IN THE DISTRICT COURT OF THE UNITED STATE**F I L E D**
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

OCT 2 5 2004

LARRY W. PROPES, CLERK
COLUMBIA, S.C.

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CIVIL ACTION NO. |
| | ) | |
| Plaintiff, | ) | **2  04  22768  13** |
| | ) | |
| vs. | ) | COMPLAINT FOR FORFEITURE |
| | ) | IN <u>REM</u> |
| $99,800.00 IN UNITED STATES | ) | |
| CURRENCY, | ) | |
| | ) | |
| Defendant. | ) | |

The Plaintiff, United States of America, a sovereign republic, by and through the
United States Attorney for the District of South Carolina and the undersigned Assistant
United States Attorney, in support of its Complaint for Forfeiture <u>in rem</u> states as follows:

## INTRODUCTION

1.    This is a civil action <u>in rem</u> brought to enforce the provisions of 18 U.S.C.
§§ 981(a)(1)(A), 981(a)(1)(C), and 21 U.S.C. § 881(a)(6). The United States of America
seeks the forfeiture of $99,800.00 in United States currency, based upon reasonable cause
to believe the property constitutes or is traceable to:

a.    proceeds furnished or intended to be furnished in exchange for controlled
substances, in violation of 21 U.S.C. §§ 841(a)(1) and 846;

b.    property involved in money laundering transactions or attempted transactions
in violation of 18 U.S.C. §§ 1956(a)(1)(A)(i) and 1956(a)(1)(B)(i);

c.    property involved in an illegal money transmitting business, in violation of 18
U.S.C. § 1960;

    d.      property involved in currency reporting violations, in violation of 31 U.S.C. § 5313(a); and/or

    e.      proceeds of some other form of specified illegal activity set forth in 18 U.S.C. § 1956(c)(7),

or was used or intended to be used to facilitate such offenses, and the said property is therefore subject to forfeiture under the provisions of 21 U.S.C. § 881(a)(6), 18 U.S.C. §§ 981(a)(1)(A) and 981(a)(1)(C).

## JURISDICTION AND VENUE

2.      This Court has jurisdiction pursuant to 28 U.S.C. §§ 1345, 1355 and 1356.

3.      Venue lies in the District of South Carolina pursuant to 28 U.S.C. §§ 1355(b)(1)(A), and 1395(b), in that the acts giving rise to the forfeiture occurred within the District of South Carolina, and the subject property is now located within the District of South Carolina and will remain so throughout the pendency of this action.

## THE DEFENDANT PROPERTY

4.      The Defendant property, in rem, consists of approximately $99,800.00 in United States currency, seized from Edward Van Wingen on September 22, 2004, in Colleton County, South Carolina, by Deputy Wade Marvin of the Colleton County Sheriff's Department.

5.      Custody of the Defendant property was transferred to the Internal Revenue Service. The Defendant currency is currently on deposit in an account under the control of said agency.

6.     In accordance with the provisions of 19 U.S.C. § 1606, the Defendant currency has a total domestic value of $99,800.00.

## POTENTIAL CLAIMANTS

7.     The individuals and/or entities whose interests may be affected by this litigation are as follows:

a.     Edward Van Wingen ("Van Wingen") may have or claim an interest in the Defendant property by virtue of the fact that he was the driver of the automobile from which the Defendant property was seized.

b.     Claude Jenni ("Jenni") may have or claim an interest in the Defendant property by virtue of the fact that, upon information and belief, he was allegedly involved in financial transactions with Van Wingen on or about the approximate time period of this seizure.

## BASIS FOR FORFEITURE

8.     Pursuant to pleading requirements of Supplemental Rule E(2)(a) for Certain Admiralty and Maritime Claims, made applicable to civil forfeitures by 28 U.S.C. § 2461(b), Plaintiff alleges that the Defendant property is subject to forfeiture to the United States based on the facts and circumstances set forth herein and in the Affidavit of Special Agent Kevin Cox of the Internal Revenue Service ("IRS"), attached hereto as **"Exhibit A"** and incorporated herein by reference, as follows:

a.     On September 22, 2004, Deputy Wade Marvin of the Colleton County

3

Sheriff's Department stopped a Chevrolet van that was traveling south on Interstate 95. Edward Van Wingen was driving the vehicle and there were no passengers in the vehicle. The vehicle was stopped for speeding and crossing the yellow line on the left side of the interstate.

b.      During the September 22, 2004 stop, Van Wingen stated that when he saw the officers on the side of the road, he tried to turn off his cruise control and ran off of the road. Deputy Marvin asked Van Wingen where he was going and Van Wingen stated he was traveling to his residence in Florida. He indicated that he had left his residence, where there was no electricity due to the recent hurricanes to get a generator. Van Wingen stated his wife had just called him and told him the electricity was back on and they did not need a generator. Deputy Marvin reviewed the rental agreement for the vehicle which Van Wingen was driving and noted Van Wingen had rented the vehicle in Newark, New Jersey. Deputy Marvin also noted that Van Wingen was acting very nervous. Specifically, his hands were shaking and he hesitated in responding to almost all of Deputy Marvin's questions.

c.      Deputy Marvin gave Van Wingen a warning ticket and then explained to Van Wingen that since 9/11 there have been a lot of problems with people carrying bags that do not belong to them. Marvin asked Van Wingen if he had any bags that did not belong to him and Van Wingen answered, "No". Marvin asked if

4

he had any bombs or guns in the vehicle and Van Wingen answered, "No". Marvin asked if there were any drugs in the vehicle and Van Wingen answered, "No". Marvin asked if there was any alcohol in the vehicle and Van Wingen stated, "No, I don't drink and drive". Marvin asked if there was a large sum of cash or currency in the vehicle and Van Wingen answered, "No, no, no". Deputy Marvin then asked "Do you mind if I search the vehicle". Van Wingen responded, "No, not at all".

d.     During the search of the vehicle, Marvin found a black ziplock bag containing U.S. currency. Marvin showed the bag to Van Wingen and Van Wingen stated "That is $2,500.00 to buy a generator". Marvin then asked Van Wingen if there was any more cash in the vehicle and Van Wingen responded, "No". Marvin continued to search the vehicle and found a green backpack containing clothes and a plastic Sheraton Hotel bag. There was a large amount of U.S. currency in an envelope inside the Sheraton bag. Van Wingen stated the money was his and all of the money together should total $100,000.00.

e.     Marvin asked Van Wingen where he got the money and he stated he got the money from his mother-in-law. Van Wingen stated that the money was from an accident his daughter was in and his mother-in-law wanted him to take it to his wife. Van Wingen then stated the money was from the death of his wife's aunt. Marvin then asked Van Wingen if he was sure and Van Wingen

5

responded, "No". Van Wingen stated that the money did not come from a bank. Deputy Jerry Polk, who was also on the scene, then asked Van Wingen where the money came from and Van Wingen stated, "O.K. (then paused), my father died and asked me to pick it up for him before he died". Van Wingen stated his father passed away on August 11, 2004.

f.     Van Wingen agreed to go to the Colleton County Sheriff's office for further questioning about the source and ownership of the currency. At the Sheriff's office Canine Truetis preformed an exterior search of three bags that were located in the vehicle Van Wingen was driving. Canine Truetis alerted to the green backpack that contained the U.S. currency.

g.     On September 22, 2004, subsequent to the seizure of the currency by the Colleton County Sheriff's Office, Internal Revenue Service Special Agents Kevin Cox and Elizabeth Duffy identified themselves to Van Wingen and presented their credentials for his inspection. Van Wingen provided the following information:

1)     Edward Fredrick Van Wingen stated he was born on August 7, 1946, in Djakarta, Indonesia. He moved to Puerto Rico with his parents in 1958 and to Florida in 1965. Van Wingen became a United States citizen when be joined the U.S. military in the 1960's. According to Van Wingen, he received an honorable discharge from the service.

2)      Van Wingen stated he is married to Cynthia Van Wingen and that they reside at 1321 SE 4th Court, Deerfield Beach, Florida 33341. Cynthia Van Wingen is not employed, but she previously worked as a bartender. Edward Van Wingen is self-employed in the yacht repair/renovating business. The name of his business is Van Gone Marine Services and it has been in existence for approximately four years. Van Gone Marine Services does not have any employees. When asked who he had been working for, Van Wingen stated he has been working on Attorney Ben Kinney's yacht since November of 2003.

3)      During the interview Van Wingen was called by Attorney Ben Kinney, who he stated was handling Van Wingen's father's estate. Van Wingen told Kinney that he was speeding and when he saw the police car he looked down to take off the cruise control and swerved out of his lane. Van Wingen stated that Kinney was not aware that he was attempting to get $100,000 from his father's Swiss account into the United States.

4)      Van Wingen stated he banks at Wachovia Bank and that prior to this he has never had more than $10,000 in cash at one time. Van Wingen stated that his father had told him that if he conducted a transaction with more than $10,000 in cash the IRS would be notified.

5)    According to Van Wingen, his mother, Adolphine Van Wingen, died approximately 8 years ago in Palm Beach, Florida. Adolphine was a citizen of the Netherlands. His father, William Peter Van Wingen, died on August 10, 2004, in Palm Beach, Florida. According to Van Wingen, his father's estate is worth approximately three million dollars. Van Wingen stated that his father had approximately two million dollars in the United States and one million in a Swiss bank account. He stated that he is the trustee and sole heir to the estate. Van Wingen has two half brothers, John and Bernard Ostmeier, through his father but neither is a beneficiary in the will. Bernard Ostmeier is estranged from the family and his father told Van Wingen to take care of John Ostmeier, who is 75 years old and lives in Palm Beach. Bernard Ostmeier lives in Georgia.

6)    Van Wingen stated that approximately one year ago when his father realized he was dying, he introduced his son to Claude Jenni, a Swiss financial advisor. The introduction occurred at his father's condo in Florida. Approximately two months ago Jenni met with William and Edward Van Wingen in Van Wingen's room at the nursing home. Approximately one week ago Edward Van Wingen met with Jenni at Van Wingen's residence in Florida and told him he needed $100,000

8

from his father's account. Jenni instructed Van Wingen to meet him in New York City to get the money. On Sunday September 19, 2004, Van Wingen took the Amtrak train from Deerfield Beach, Florida to New York City, New York. Van Wingen stated that he does not like to fly and did not want to drive to New York because he was tired. Van Wingen rented a car in New York and checked into the Sheraton Russell Hotel. Van Wingen then contacted Claude Jenni who was staying at the Warwick Hotel on 65 West 54th Street in New York. The number to the hotel is (212)247-2700, according to Van Wingen. Jenni delivered a white envelope containing what was represented to be $100,000 in cash to Van Wingen. Van Wingen took $2,500 out of the envelope and placed the envelope in a plastic bag from the Sheraton Hotel. Van Wingen drove to a Sheraton Hotel in either North Carolina or Virginia and spent the night of September 21, 2004.

7)    Van Wingen stated he was going to deposit the money into his bank account. The money was going to be used to remodel John Ostmeier's condo and to pay some bills. After being advised that a CTR had been filed on him in the past, Van Wingen, revised his story about never having in excess of $10,000 in cash in the past and stated he was aware of the CTR filing requirements. Van Wingen stated that he believed the

9

money was illegal, but did not know from what illegal source.

8)  Van Wingen stated that Jenni did not bring the money into United States and to his knowledge did not wire the money here. Van Wingen believed Jenni got the money from someone in New York and was going to transfer $100,000 from Van Wingen's account in Switzerland to an account for that individual in Switzerland. Van Wingen could not explain why the money was not wired directly into one of his accounts in Florida.

9)  Van Wingen stated that he signed a blank sheet of paper for Jenni. The signature on the blank sheet of paper was to allow Jenni to transfer the $100,000 to the other client's account and to move the balance of William Van Wingen's account into an account in the name of Edward Van Wingen.

h.  During the interview of Van Wingen and with his consent, Agent Cox telephoned Claude Jenni on his cellular telephone. Jenni provided the following information:

1)  Jenni stated that he is a citizen of Switzerland and was in the United States on a visitor's VISA.

2)  Jenni has known Edward Van Wingen his entire life.

3)  Jenni stated that he had not conducted a financial transaction with Van

10

Wingen in the past two weeks.

4)    Van Wingen instructed Jenni to tell the truth.  Jenni then stated that he gave Van Wingen $100,000 in cash in Wingen's hotel room in New York.

5)    Jenni stated that he controlled money in Switzerland for William Van Wingen.  The $100,000 given to Edward Van Wingen was from the money in Switzerland.

6)    Jenni stated that he does not have a money transmitter's license in the United States.

7)    Jenni claimed that he did not bring the money into the United States nor did he cause the money to be brought into the United States by any other individual or group of individuals.

8)    Jenni stated that he did not wire the money into the United States and would not/could not explain why he did not wire the money.

9)    Jenni stated he got the $100,000 from another client in the United States and would not provide the identity of the client or what business they were involved with. Jennie has several clients in the United States and claimed their personal information was covered by the banking privacy act.

10)    Jenni stated that he has entered the United States four times this year.

Three of the trips were for business and one was for pleasure.

i.    On September 22, 2004, Agent Cox telephoned Van Wingen at his residence in Florida and asked him if he was still willing to cooperate in the investigation. Van Wingen stated that he was, but that he had retained Attorney Kenneth Lipman to represent him. The conversation was ended and later on the same day Attorney Lipman telephoned Agent Cox to discuss the details of the investigation. Lipman advised Agent Cox that he was on the speaker phone and Van Wingen was present. Agent Cox then provided the evidence gathered to this point in the investigation. Lipman expressed a concern that Claude Jenni could clean out Van Wingen's Swiss account if he wanted to. Agent Cox stated that he shared this concern as Van Wingen had signed a blank sheet of paper for Jenni. Lipman questioned whether or not the paper was blank and Van Wingen stated that it was blank because Jenni did not want to have numbers on it just in case he was stopped.

9.    Based on the information and allegations set forth herein and in the attached Affidavit of Special Agent Kevin Cox, there is reasonable cause to believe that the Defendant property constitutes or is traceable to:

a.    proceeds furnished or intended to be furnished in exchange for controlled substances, in violation of 21 U.S.C. §§ 841(a)(1) and 846;

b.    property involved in money laundering transactions or attempted transactions in violation of 18 U.S.C. §§1956(a)(1)(A)(i) and 1956(a)(1)(B)(i);

c.     property involved in an illegal money transmitting business, in violation of 18 U.S.C. §1960;

d.     property involved in currency reporting violations, in violation of 31 U.S.C. §5313(a); and/or

e.     proceeds of some other form of specified illegal activity set forth in 18 U.S.C. § 1956(c)(7),

or was used or intended to be used to facilitate such offenses and the said property is therefore subject to forfeiture under the provisions of 21 U.S.C. § 881(a)(6), 18 U.S.C. §§ 981(a)(1)(A) and 981(a)(1)(C).

## CONCLUSION

10.     By reason of these premises and pursuant to 18 U.S.C. § 981(f) and 21 U.S.C. § 881(h), whereby the Plaintiff's right, title and interest in and to the Defendant property relates back to the commission of the act giving rise to the forfeiture, the Defendant property has become and is forfeited to the United States of America, to be disposed of pursuant to Supplemental Rule E(9)(a) for Certain Admiralty and Maritime Claims, 18 U.S.C. § 981(d), 21 U.S.C. § 881(e) and other applicable laws.

WHEREFORE, Plaintiff prays: that due process issue to enforce the forfeiture of the Defendant, in rem; that a Warrant for the Arrest and Seizure of the Defendant property be issued; that due Notice be given to all interested persons to appear, make claim, answer and show cause why the forfeiture should not be decreed; that the Defendant property be decreed condemned and forfeited to the United States of America for disposition according to law;

13

and that Plaintiff have such other and further relief as the Court may deem just and proper,

together with the costs and disbursements of this action.

Respectfully submitted,

J. STROM THURMOND, JR.
UNITED STATES ATTORNEY

BY: _____
      DEBORAH B. BARBIER (#6639)
Assistant U.S. Attorney
1441 Main Street, Suite 500
Columbia, South Carolina  29201
Telephone: (803) 343-3174

October 15, 2004

14

STATE OF SOUTH CAROLINA      )

                                     )     <u>V E R I F I C A T I O N</u>

COUNTY OF RICHLAND         )

       I, Deborah B. Barbier, Assistant United States Attorney for the District of South Carolina, declare and state that I am the attorney having responsibility for prosecution of the above-entitled forfeiture action; that I have read the Complaint for Forfeiture <u>in rem</u> filed herein and know the contents thereof; that the allegations of the Complaint for Forfeiture <u>in rem</u> are based upon reports and information furnished to me by agents of the Internal Revenue Service and the Colleton County Sheriff's Department, and the same are true and correct to the best of my knowledge, information and belief.

                                    DEBORAH B. BARBIER
                                    Assistant United States Attorney

SWORN TO before me this _____25th_____

day of ___October_____, 2004.

_____ (L.S.)
NOTARY PUBLIC FOR SOUTH CAROLINA

My Commission expires: ___8-31-2010___

| | | |
|---|---|---|
| **STATE OF SOUTH CAROLINA** | ) | |
| | ) | **AFFIDAVIT** |
| **COUNTY OF CHARLESTON** | ) | |

I, C. Kevin Cox, having been first duly sworn, depose and say as follows:

## AFFIANT'S BACKGROUND

1.      That I am a Special Agent of the United States Treasury Department, Internal Revenue Service, Criminal Investigation Division (IRS-CID), and have been so employed for the past thirteen years. In connection with my official duties, I investigate criminal violations of the Internal Revenue Code and Money Laundering statutes. In my capacity as a special agent, I have received specialized training in the enforcement of laws concerning violations found in Title 26, United States Code, Title 18, United States Code, and Title 31, United States Code.

2.      That based upon my training, experience, and participation in investigations involving violations of Title 26, Title 18, and Title 31, in particular, I know:

      a.      That individuals involved in the sale and distribution of illegal narcotics and other illegal activities attempt to conceal the wealth gained from these activities by structuring cash transactions at financial institutions and/or utilizing illegal money transmitters, in order to avoid the filing of Currency Transaction Reports (Form 4789) with the Internal Revenue Service, as required by law. These individuals also refuse to file the Form 8300 (Report of Cash Payment over $10,000 Received in a Trade or Business, required to be filed with the Internal Revenue Service) in an attempt to avoid detection by the government.

      b.      That the proceeds of illegal narcotic sales and other illegal activities are either invested in the United States or exported out of the Untied States.

      c.      That owners of illegal proceeds utilize unlicensed money brokers to get their currency out of the U.S. These money brokers will sell the illegal currency to individuals or companies needing to get money into the U.S. from foreign countries. This practice allows them to avoid the CMIR filing requirements for transporting currency into or out of the U.S. It also allows them to avoid the paper trail caused by electronic fund transfers between accounts.

**Exhibit A**

d.  That Interstate 95 is heavily utilized by dealers in illegal narcotics to transport their narcotics to the north and to return the proceeds of the illegal narcotic sales to the south.

e.  That one of the methods employed by individuals involved in the sale and distribution of illegal narcotics and other illegal activities is to utilize couriers to transport the profits from their illegal enterprises.

f.  That individuals carrying large amounts of illegal currency will often times lie to law enforcement officers about having large amounts of currency in their possession. They will also change their stories about the source of the currency in an attempt to legitimize the money.

## **INVESTIGATION**

3.  This affidavit is made in support of the forfeiture of $99,800.00 seized from Edward Van Wingen on September 22, 2004.

4.  On September 22, 2004, Deputy Wade Marvin of the Colleton County Sheriff's Department stopped a Chevrolet van that was traveling south on Interstate 95. Edward Van Wingen was driving the vehicle and there were no passengers in the vehicle. The vehicle was stopped for speeding and crossing the yellow line on the left side of the interstate.

5.  During the September 22, 2004 stop, Van Wingen stated that when he saw the officers on the side of the road, he tried to turn off his cruise control and ran off of the road. Deputy Marvin asked Van Wingen where he was going and Van Wingen stated he was traveling to his residence in Florida. He indicated that he had left his residence, where there was no electricity due to the recent Hurricanes to get a generator. Van Wingen stated his wife had just called him and told him the electricity was back on and they did not need a generator. Deputy Marvin reviewed the rental agreement for the vehicle which Van Wingen was driving and noted that Van Wingen had rented the vehicle in Newark, New Jersey. Deputy Marvin also noted that Van Wingen was acting very nervous. Specifically, his hands were shaking and he hesitated in responding to almost all of Deputy Marvin's questions.

6.  Deputy Marvin gave Van Wingen a warning ticket and then explained to Van Wingen that since 9/11 there have been a lot of problems with people carrying bags that do not belong to them. Marvin asked Van Wingen if he had any bags that did not belong to him and Van Wingen answered, "No". Marvin asked if he had any bombs or guns in

the vehicle and Van Wingen answered, "No". Marvin asked if there were any drugs in the vehicle and Van Wingen answered, "No". Marvin asked if there was any alcohol in the vehicle and Van Wingen stated, "No, I don't drink and drive". Marvin asked if there was a large sum of cash or currency in the vehicle and Van Wingen answered, "No, no, no". Deputy Marvin then asked "Do you mind if I search the vehicle". Van Wingen responded, "No, not at all".

7.    During the search of the vehicle, Marvin found a black zip lock bag containing U.S. currency. Marvin showed the bag to Van Wingen and Van Wingen stated "That is $2,500.00 to buy a generator". Marvin then asked Van Wingen if there was any more cash in the vehicle and Van Wingen responded, "No". Marvin continued to search the vehicle and found a green backpack containing clothes and a plastic Sheraton Hotel bag. There was a large amount of U.S. currency in an envelope inside the Sheraton bag. Van Wingen stated the money was his and all of the money together should total $100,000.00.

8.    Marvin asked Van Wingen where he got the money and he stated he got the money from his mother-in-law. Van Wingen stated that the money was from an accident his daughter was in and his mother-in-law wanted him to take it to his wife. Van Wingen then stated the money was from the death of his wife's aunt. Marvin then asked Van Wingen if he was sure and Van Wingen responded, "No". Van Wingen stated that the money did not come from a bank. Deputy Jerry Polk, who was also on the scene, then asked Van Wingen where the money came from and Van Wingen stated, "O.K. (then paused), my father died and asked me to pick it up for him before he died". Van Wingen stated his father passed away on August 11, 2004.

9.    Van Wingen agreed to go to the Colleton County Sheriff's office for further questioning about the source and ownership of the currency. At the Sheriff's office Canine Truetis preformed an exterior search of three bags that were located in the vehicle Van Wingen was driving. Canine Truetis alerted to the green backpack that contained the U.S. currency.

10.    On September 22,2004, subsequent to the seizure of the currency by the Colleton County Sheriff's Office, your affiant and Internal Revenue Service Special Agent Elizabeth Duffy identified ourselves to Van Wingen and presented our credentials for his inspection. Van Wingen provided the following information:

a)    Edward Fredrick Van Wingen stated he was born on August 7, 1946, in Djakarta, Indonesia. He moved to Puerto Rico with his parents in 1958 and to Florida in 1965. Van Wingen became a United States citizen when be joined the U.S. military in the 1960's. According to Van Wingen, he received an honorable discharge from the service.

b)    Van Wingen stated he is married to Cynthia Van Wingen and that they reside at 1321 SE 4th Court, Deerfield Beach, Florida 33341. Their home telephone number is (954) 596-0446 and Edward Van Wingen's cellular telephone number is (954) 931-1020. Edward Van Wingen's social security number is 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. Cynthia Van Wingen is not employed, but she previously worked as a bartender. Edward Van Wingen is self-employed in the yacht repair/renovating business. The name of his business is Van Gone Marine Services and it has been in existence for approximately four years. Van Gone Marine Services does not have any employees. When asked who he had been working for, Van Wingen stated he has been working on Attorney Ben Kinney's yacht since November of 2003.

c)    During the interview Van Wingen was called by Attorney Ben Kinney, who he stated was handling Van Wingen's father's estate. Van Wingen told Kinney that he was speeding and when he saw the police car he looked down to take off the cruise control and swerved out of his lane. Kinney's telephone number is (567)683-2484. Van Wingen stated that Kinney was not aware that he was attempting to get $100,000 from his father's Swiss account into the United States.

d)    Van Wingen stated he banks at Wachovia Bank and that prior to this he has never had more than $10,000 in cash at one time. Van Wingen stated that his father had told him that if he conducted a transaction with more than $10,000 in cash the IRS would be notified.

e)    According to Van Wingen, his mother, Adolphine Van Wingen, died approximately 8 years ago in Palm Beach, Florida. Adolphine was a citizen of the Netherlands. His father, William Peter Van Wingen, died on August 10, 2004, in Palm Beach, FL. According to Van Wingen, his father's estate is worth approximately three million dollars. Van Wingen stated that his father had approximately two million dollars in the United States and one million in a Swiss bank account. He stated that he is the trustee and sole heir to the estate. Van Wingen has two half brothers, John and Bernard Ostmeier, through his father but neither is a beneficiary in the will. Bernard Ostmeier is estranged

4

from the family and his father told Van Wingen to take care of John Ostmeier, who is 75 years old and lives in Palm Beach. Bernard Ostmeier lives in Georgia.

f)    Van Wingen stated that approximately one year ago when his father realized he was dying, he introduced his son to Claude Jenni, a Swiss financial advisor. The introduction occurred at his father's condo in Florida. Approximately two months ago Jenni met with William and Edward Van Wingen in Van Wingen's room at the nursing home. Approximately one week ago Edward Van Wingen met with Jenni at Van Wingen's residence in Florida and told him he needed $100,000 from his father's account. Jenni instructed Van Wingen to meet him in New York City to get the money. On Sunday September 19, 2004, Van Wingen took the Amtrak train from Deerfield Beach, Florida to New York City, New York. Van Wingen stated that he does not like to fly and did not want to drive to New York because he was tired. Van Wingen rented a car in New York and checked into the Sheraton Russell Hotel. Van Wingen then contacted Claude Jenni who was staying at the Warwick Hotel on 65 West 54th Street in New York. The number to the hotel is (212)247-2700, according to Van Wingen. Jenni delivered a white envelope containing what was represented to be $100,000 in cash to Van Wingen. Van Wingen took $2,500 out of the envelope and placed the envelope in a plastic bag from the Sheraton Hotel. Van Wingen drove to a Sheraton Hotel in either North Carolina or Virginia and spent the night of September 21, 2004.

g)    Van Wingen stated he was going to deposit the money into his bank account. The money was going to be used to remodel John Ostmeier's condo and to pay some bills. After being advised that a CTR had been filed on him in the past. Van Wingen, revised his story about never having in excess of $10,000 in cash in the past and stated he was aware of the CTR filing requirements. Van Wingen stated that he believed the money was illegal, but did not know from what illegal source.

h)    Van Wingen stated that Jenni did not bring the money into United States and to his knowledge did not wire the money here. Van Wingen believed Jenni got the money from someone in New York and was going to transfer $100,000 from Van Wingen's Account in Switzerland to an account for that individual in Switzerland. Van Wingen could not explain why the money was not wired directly into one of his accounts in Florida.

5

i)  Van Wingen stated that he signed a blank sheet of paper for Jenni. The signature on the blank sheet of paper was to allow Jenni to transfer the $100,000 to the other client's account and to move the balance of William Van Wingen's account into an account in the name of Edward Van Wingen.

11. During the interview of Van Wingen and with his consent, Your affiant telephoned Claude Jenni on his cellular telephone. Jenni provided the following information:

a)  Jenni stated that he is a citizen of Switzerland and was in the United States on a visitors VISA.

b)  Jenni has known Edward Van Wingen his entire life.

c)  Jenni stated that he had not conducted a financial transaction with Van Wingen in the past two weeks.

d)  Van Wingen instructed Jenni to tell the truth. Jenni then stated that he gave Van Wingen $100,000 in cash in Wingen's hotel room in New York.

e)  Jenni stated that he controlled money in Switzerland for William Van Wingen. The $100,000 given to Edward Van Wingen was from the money in Switzerland.

f)  Jenni stated that he does not have a money transmitters license in the United States.

g)  Jenni claimed that he did not bring the money into the United States nor did he cause the money to be brought into the United States by any other individual or group of individuals.

h)  Jenni stated that he did not wire the money into the United States and would not/could not explain why he did not wire the money.

i)  Jenni stated he got the $100,000 from another client in the United States and would not provide the identity of the client or what business they were involved with. Jennie has several clients in the United States and claimed their personal information was covered by the banking privacy act.

j)  Jenni stated that he has entered the United States four times this year. Three of the trips were for business and one was for pleasure.

6

12.    On September 22, 2004, Your Affiant telephoned Van Wingen at his residence in Florida and asked him if he was still willing to cooperate in the investigation. Van Wingen stated that he was, but that he had retained Attorney Kenneth Lipman to represent him. The conversation was ended and later on the same day Attorney Lipman telephoned your Affiant to discuss the details of the investigation. Lipman advised me that he was on the speaker phone and Van Wingen was present. Your Affiant then provided the evidence gathered to this point in the investigation. Lipman expressed a concern that Claude Jenni could clean out Van Wingen's Swiss account if he wanted too. Your Affiant stated that he shared this concern as Van Wingen had signed a blank sheet of paper for Jenni. Lipman questioned whether or not the paper was blank and Van Wingen stated that it was blank because Jenni did not want to have numbers on it just in case he was stopped.

## AFFIANT'S CONCLUSIONS

13.    Edward Van Wingen made several contradictory statements to Deputy Marvin and this affiant. Based on my experience as a special agent, it is my opinion that Van Wingen made the contradictory statements because he was attempting to conceal the true source of the currency and the illegal financial transaction he was involved with from law enforcement officers.

14.    Edward Van Wingen accepted illegal proceeds from an unlicensed money transmitter in order to avoid the filing of the CMIR Form that would have been required if the currency would have been brought into the United States from Switzerland. Also, Van Wingen avoided the paper trail of the money being wired into his U.S. bank account from Switzerland. He also avoided the filing of a Currency Transaction Report by his financial institutions if he would have attempted to withdraw more than $10,000 from his account in the U.S. Van Wingen's intentions were made clear when he signed a blank sheet of paper for Jenni, so no amounts or account numbers would be detected by law enforcement officials, if Jenni were searched leaving the U.S.

15.    Based on my experience as a special agent and the facts and circumstances presented in this affidavit, it is my opinion there is probable cause to believe that the Defendant property constitutes or is traceable to:

    a.    proceeds furnished or intended to be furnished in exchange for controlled substances, in violation of 21 U.S.C. §§ 841(a)(1) and 846;

    b.    property involved in money laundering transactions or attempted transactions

7

in violation of 18 U.S.C. §§1956(a)(1)(A)(i), 1956(a)(1)(B)(i), 1956(h) and 1957;

c.    property involved in an illegal money transmitting business, in violation of 18 U.S.C. §1960;

d.    property involved in currency reporting violations, in violation of 31 U.S.C. §5313(a) and Section 5324(c)(1) and (3); and/or

e.    proceeds of some other form of specified illegal activity set forth in 18 U.S.C. §1956(c)(7),

or was used or intended to be used to facilitate such offenses and the said property is therefore subject to forfeiture under the provisions of 21 U.S.C. §§881(a)(6) and 881(a)(4), 18 U.S.C. §§981(a)(1)(A) and 981(a)(1)(C).


_____
C. Kevin Cox Special Agent
IRS/CID

SWORN TO before me this 25th
day of October , 2004.

_____ (L.S.)
NOTARY PUBLIC FOR SOUTH CAROLINA
My Commission expires: 10-30-2005

8